**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ART AKIANE LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 19-cv-02952 |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| ART & SOULWORKS LLC, and | ) | |
| CAROL CORNELIUSON, | ) | |
| | ) | |
| Defendants. | ) | |

**RESPONSE TO PLAINTIFF'S MOTION FOR ENTRY OF A
TEMPORARY RESTRAINING ORDER, INCLUDING TEMPORARY
INJUNCTION AND A TEMPORARY ASSET RESTRAINT**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................... 3

ARGUMENT .................................................................................................................... 11

I.    Art Akiane Has Not Made the Required "Threshold Showing" That It Is Entitled to a
      Temporary Restraining Order ................................................................................. 11

      A. Art Akiane Has Not Established That It Will Suffer *Imminent* and Irreparable Harm
         in the Absence of a Temporary Restraining Order ............................................ 11

      B. Art Akiane Has Not Established That It Is Likely to Succeed on the Merits of Its
         Claims Against Defendants ............................................................................... 13

         1.  Defendants Have Not Committed Any Copyright Violations ....................... 13

         2.  Art Akiane Does Not Have Trademark Claims ........................................... 16

         3.  Defendants Have Not Violated the Digital Millennium Copyright Act .......... 17

         4.  Art Akiane's State Law Claims Are Preempted .......................................... 18

      C. Plaintiff has Unclean Hands .............................................................................. 19

      D. Defendants Will Be Significantly Harmed If They Are Enjoined from Selling ............... 20

      E. Any Injunction Requires a Significant Bond ....................................................... 21

# TABLE OF AUTHORITIES

## Cases

*ABF Freight Sys., Inc. v. NLRB*, 510 U.S. 317 (1994) ................................................................ 19

*Audi AG v. D'Amato*, 469 F.3d 534 (6th Cir. 2006) .................................................................. 13

*Baltimore Orioles, Inc. v. Major League Baseball Players Ass'n*, 805 F.2d 663
    (7th Cir. 1986) .......................................................................................................................... 18

*Boehm v. Svehla*, No. 15-cv-379-jhp, 2017 WL 4326308 (Sept. 27, 2017 W.D. Wis.) .............. 15

*Bryant v. Gordon*, 483 F. Supp. 2d 605 (N.D. Ill. 2007) ............................................................ 15

*Capitol Converting Equipment, Inc. v. LEP Transport, Inc.,* 965 F.2d 391 (7th Cir.1992) ........ 20

*Coyne–Delany Co. v. Capital Development Board,* 717 F.2d 385 (7th Cir.1983) ...................... 21

*Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376 (7th Cir. 2003)............................ 20

*Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 US 23 (2003) .................................... 16

*eBay Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006).............................................................. 12

*Eli Lilly & Co. v. Nat. Answers, Inc.*, 233 F.3d 456 (7th Cir. 2000) .......................................... 12

*Ferrlng Pharm., Inc. v. Watson Pharm., Inc.*, 765 F.3d 205 (3d Cir. 2014) .............................. 13

*Flava Works, Inc. v. Gunter*, 689 F.3d 754 (7th Cir. 2012)........................................................ 12

*H & H Press, Inc. v. Axelrod,* 638 N.E.2d 333 (Ill.App.Ct. 1st Dist.1994)................................. 20

*Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239 (9th Cir. 2013) ................. 13

*Jackson v. Payday Fin., LLC*, 764 F.3d 765 (7th Cir. 2014) ...................................................... 11

*Kelly v. Arriba Soft. Corp.*, 77 F.Supp.2d 1116 (C.D.Cal. 1999) .............................................. 17

*Lee v. Deck the Walls, Inc.*, 925 F. Supp. 576 (N.D. Ill. 1996) .................................................. 15

*Mkt. Track, LLC v. Efficient Collaborative Retail Mktg., LLC*, 2015 WL 3637740
    (N.D. Ill. June 12, 2015).......................................................................................................... 13

*Monotype Imaging, Inc. v. Bitstream, Inc.*, 376 F.Supp.2d 877 (N.D. Ill 2005) ........................ 18

*Nat'l Fin. Partners Corp. v. Paycom Software, Inc.*, 2015 WL 3633987
    (N.D. Ill. June 10, 2015).......................................................................................................... 13

*Natkin v. Winfrey*, 111 F. Supp. 2d 1003 (N.D. Ill. 2000)............................................................ 19

*Parfums Givenchy v. C & C Beauty Sales*, 832 F. Supp. 1378 (C.D. Cal. 1993)........................ 15

*Personal Keepsakes, Inc. v. PersonalizationMall.Com, Inc.*, 975 F.Supp.2d 920
    (N.D. Ill. 2013)....................................................................................................... 16, 17, 18

*ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447 (7th Cir. 1996) .......................................................... 18

*Roche Diognostics Corp. v. Medical Automation Systems, Inc.*, 646 F.3d 424 (7th Cir. 2011).... 21

*Swarovski Aktiengesellschaft v. Bldg. No. 19, Inc.*, 704 F.3d 44 (1st Cir. 2013) ......................... 13

*Toney v. L'Oreal USA, Inc.*, 406 F.3d 905 (7th Cir. 2005) ........................................................ 18

*Traffic Tech., Inc. v. Kreiter*, No. 14-cv-7528, 2015 WL 9259544 (N.D. Ill. Dec. 18, 2015) ..... 11

*W.R. Grace & Co. v. Rubber Workers,* 461 U.S. 757 (1983) ...................................................... 21

*Zahl v. Krupa*, 850 N.E.2d 304 (Ill. App. Ct. 2006) ................................................................. 19

**Other Authorities**

17 U.S.C. § 101 ........................................................................................................................ 14

17 U.S.C. § 109 ........................................................................................................................ 14

17 U.S.C. § 109(a) ................................................................................................................... 15

17 U.S.C. § 1202 ...................................................................................................................... 17

## INTRODUCTION

This case is a quintessential example of what can happen when a mutually rewarding relationship, governed for more than a decade by a written agreement and the parties' extensive course of dealings, is eviscerated in a single instant by the rash and bad faith action of one party -- in this case, plaintiff Art Akiane, LLC. Art Akiane comes to this Court seeking the extraordinary and equitable relief of a temporary restraining order ("TRO"), but it does so with hands that are not just dirty, they are stained by bad faith conduct intentionally designed to inflict the most damage possible on Defendants Art & SoulWorks, LLC ("ASW") and its owner, Carolyn Corneliuson, and to put them both out of business.

In its moving papers and its Complaint, Art Akiane purposely misleads the Court by omitting salient facts that not only give context to the parties' relationship and the actions of ASW, but also illustrates why plaintiff cannot establish the "likelihood of success on the merits" necessary for obtaining a TRO. For example, as discussed more fully below, plaintiff neglects to inform the Court that Defendants' rights arose, and in some cases continue, under three distinct circumstances: (a) by virtue of a licensing agreement in place between the parties for 11 years that governed sales of certain Akiane works ("licensed sales"); (b) from a verbal agreement between the parties that allowed ASW to market and sell Akiane prints, paintings and other works that were purchased from Art Akiane at wholesale prices ("wholesale sales"); and (c) by virtue of the rights that Corneliuson and ASW obtained through the "first sale doctrine," which attaches to approximately 10 original or limited edition pieces purchased at full price from Art Akiane for ASW's and/or Corneliuson's private collection.

Nor does Art Akiane disclose its clear breach of the duty of good faith and fair dealing implied in every contract, which is what has caused the parties to be before the Court today. For

1

example, even though Art Akiane knew full well that it had no intention of renewing the parties'
Licensing Agreement for the fourth time, Art Akiane chose not to alert Corneliuson or ASW of
this fact until a day before the agreement expired; even allowing ASW to make a purchase of
$11,000 worth of merchandise one day before Art Akiane terminated the agreement. (Carolyn
Corneliuson Declaration ("CC Decl.") at __).  By giving notice of non-renewal on the last day of
the agreement, demanding that ASW remove *all* references to its decades-long position as the
exclusive and original source of Art Akiane work from all media *that same day*, and insisting
that all remaining inventory under the Licensing Agreement be liquidated within 6-7 weeks, Art
Akiane acted in bad faith and caused substantial irreparable damage to ASW. It did so by
knowingly eviscerating without notice the source of close to 85% of the Art & Soulworks
business; requiring an immediate liquidation of licensed inventory at fire sale prices; and causing
ASW to cancel orders and trade shows, losing money in the process and eviscerating decades-
long business relationships, including to customers who relied on ASW for Easter and other
merchandise. These losses to ASW reach into the millions and have resulted in the previously
avoidable but now existential crisis ASW finds itself in now. Effectively, Art Akiane has put
ASW out of business by its conduct.

Finally, notwithstanding the misconduct by plaintiff that gives rise to ASW's
counterclaims and defenses to this TRO, ASW has ***not*** engaged in the conduct alleged in the
Complaint or the motion for TRO.  Rather, at plaintiff's direction, ASW liquidated all of its
licensed sales inventory.  It also changed the language on its website to language approved by
plaintiff (to "a trusted source of Art Akiane work" instead of the "official source of"…). AWS
also hid hundreds of pages of its website that previously displayed works covered by the
Licensing Agreement, and placed language on its website informing the public it is no longer the

licensed seller of Art Akiane work. AWS now only sells the pieces it bought through the wholesale agreement between the parties for resale, and pieces that are part of its private collection.

Art Akiane does not have a likelihood of success on the merits, cannot establish the other elements needed to obtain a TRO or preliminary injunction, and its motion should be denied in its entirety.

## BACKGROUND

Art & Soulworks is a business created about 10 years ago by Carolyn Corneliuson to reflect her devotion to God and to help further her mission to be an example to others. (Declaration of Carolyn Corneliuson ("CC Decl.") at ¶4). Prior to starting ASW, Corneliuson had a successful career as an entrepreneur and for the last 8 years before ASW, was a Director of Antioch Publishing, dealing with licensing for Disney and interacting with relationship partners such as Barnes and Noble, Scholastic, Walden Books and Christian Family. (*Id.*) Through the www.art-soulworks.com website, trade shows, social media and other avenues, ASW provides a variety of religious-based gifts and art designed to inspire, educate and promote Bible-based values to individuals and families globally. (*Id*. at ¶5). ASW donates 20% of its proceeds to local, national and global programs dedicated to helping those in need. (*Id*. at ¶6).

***The 2008-2019 Licensing Agreement:*** Beginning in 2006, Art & SoulWorks began a relationship with the Kramarik family, at first creating products such as bookmarks reflecting Akiane's art and selling them to retail outlets like Barnes & Noble. (CC Decl. at ¶7). The parties formalized their relationship in writing in 2008 through the Art Akiane, LLC & Art & SoulWorks, LLC Art Images & Licensing Agreement ("Licensing Agreement"). (CC Decl. at ¶8). Plaintiff chose not to attach the 1.5 page agreement to either this motion or the Complaint,

perhaps because doing so would illustrate the obvious – the 11-year relationship between the parties was governed more by conduct than by expansive contractual provisions.  (A copy of the Licensing Agreement is attached to the CC Decl. as Exhibit ("Ex.") 1).

The Licensing Agreement had an initial term of five years, was renewed in 2012 until 2015 via a second round of signatures on the original agreement, and was renewed again in 2016 (via a third set of signatures on the original agreement) until January 11, 2019. (*Id.* at ¶9). This demonstrates a pattern of renewal, even after the expiration date of the Licensing Agreement. Contrary to the allegations in plaintiff's Memorandum in Support of a TRO ("Memo."), ASW was not limited to the manufacture, reproduction, marketing and sales of solely the works listed on page 6 of plaintiff's Memo (which are the same works reflected in the first Schedule A (hereafter "Schedule A1") to the License Agreement. (*Id.* at ¶10). Rather, the parties appended a second Schedule A (hereafter "Schedule A2") as part of the 2016 Licensing Agreement renewal, which gave ASW rights in "All images painted, drawn, sketched or otherwise created by Akine [sic] Kramarik from age 4 to current." (*Id.* at ¶11; Ex. 1).

Per the Licensing Agreement, ASW paid Art Akiane a 10% royalty on the wholesale price of all items sold under the agreement (the "licensed sales"). (*Id.* at ¶12). There is no provision in the contract that addresses the wind-down of the relationship or the parties' obligations in the event the contract is not renewed after expiration. (*Id.* at ¶13).

***The Wholesale Sales:***  In addition to the licensing rights described above, beginning in 2008, ASW and Art Akiane also had an oral agreement allowing ASW to sell and market additional works and products. (*Id.* at ¶14). This agreement arose out of a request from Art Akiane that ASW essentially mimic the Akiane Gallery website to enhance the exposure and selling opportunities of Akiane's prints and paintings. (*Id.* at ¶15).  At ASW's own expense, it

4

greatly expanded its website to include paintings, prints and canvasses of Art Akiane, with the assistance of Art Akiane to ensure accurate descriptions and appropriate photos of all of these works. (*Id.* at ¶16). As part of this ongoing agreement, ASW could display on its website and elsewhere works sold by Akiane Gallery. (*Id.* at ¶17). ASW either purchase these works at wholesale prices and kept them in inventory for customers, or, if a customer expressed interest in a piece that ASW was allowed to market but had not yet purchased, ASW would then purchase the piece from Akiane Gallery at the wholesale price (50% discount off of retail prices), and resell the piece to the customer with Art Akiane's blessing. (These sales are referred to as "wholesale sales"). (*Id.* at ¶18). One example of the latter is reflected in the 7/1/2010 email between ASW and Art Akiane along with an ASW Purchase Order and request that Art Akiane ship to ASW's customer. (*Id*. at ¶18; 7/1/2010 email and Purchase Order are attached as Ex. 2).

ASW publicized these pieces on its website, Twitter, Instagram, youtube, in marketing materials and at trade shows, with full knowledge and assistance by Art Akiane. (*Id*. at ¶20). Not only were these wholesale sales requested and endorsed by Art Akiane, but they were totally facilitated with its approval, as ASW had to obtain the pieces to resell from Art Akiane itself. (*Id*. at ¶21). In fact, Art Akiane often drop-shipped items that were not yet in ASW's inventory to customers that came through ASW's social media sites or website to purchase. (*Id.* at ¶22; Ex. 2). A spreadsheet reflecting the more than 50,000 "wholesale sales" that ASW made with Art Akiane's knowledge, blessing and pursuant to the oral agreement, is attached to the CC Decl. as Ex. 3. [1] (*Id*. at ¶23).

---

[1]    Even after the termination by Art Akiane, ASW and Corneliuson forwarded interested customers to Art Akiane. (CC Decl. at 24). In fact, the email exchange attached as Ex. 4 to the Corneliuson Declaration shows that Defendants sent Art Akiane a customer who made three expensive purchases – purchases for which promised commissions have still not been paid to ASW.

*The Private Collection:* In addition to the licensed and wholesale sales described above, at various points in time, ASW or Corneliuson purchased original or limited edition pieces from the Art Akiane Gallery at full price for Corneliuson's private collection ("private collection" pieces). (*Id.* at ¶25). It is estimated that 10 pieces of art are currently owned in this collection. (*Id.* at ¶26). These prices currently have a retail value of approximately $600,000 or more. (*Id.* at ¶27).

*ASW's and Corneliuson's Reliance on the Parties' Course of Dealings and Duty of Good Faith:* ASW and Corneliuson relied on the parties' course of dealings over the span of their more than 11-year relationship in conducting its business. (*Id.* at ¶28) For example, since the contractual relationship began, ASW and Corneliuson expended hundreds of thousands of dollars on inventory, paying for and attending trade shows, building out and maintaining its website, paying staff, drafting content and continuously trying to promote Akiane, her works and Art Akiane and Akiane Gallery. (*Id.* at ¶29). These expenditures continued in the months leading up to the non-renewal. (*Id.* at ¶30). In making them, Corneliuson trusted that, as they had many times before, the parties would renew the Licensing Agreement, and the verbal wholesale agreement allowing her purchase, display and resell other Akiane works, would continue to be in effect. (*Id.* at ¶31). While Corneliuson recognized that the parties' relationship might not continue forever, she reasonably expected that any cessation of the relationship would occur only with sufficient advanced notice to ensure that her entire business did not fail in the process. (*Id.* at ¶32.)

So unaware that there was any intention of non-renewal, ASW committed to trade shows, advertising, marketing brochures and collateral, new product orders well into 2019, for which it had already expended substantial amounts of money. (*Id.* at ¶33). Also, as it had for the previous

years of their relationship, ASW created the 2019 "Prince of Peace" calendar, and committed to the 2020 calendar, as well as many other items intended for sale in 2019 and beyond. (*Id.* at ¶34). ASW also placed an order of $11,000 worth of wholesale sales merchandise on January 10 – one day before Art Akiane summarily terminated the relationship. (*Id.* at ¶35). Art Akiane did nothing to dissuade ASW of this purchase. (*Id.* at ¶36).

In the months leading up to the termination, Art Akiane continued to send videos and links to ASW of new Akiane works to ensure that the ASW website posted them simultaneously with the Akiane Gallery to multiply the exposure. (*Id.* at ¶37). An email written by Jeanlu Kramarik attached as Ex. 5 to the Corneliuson Declaration illustrates that Art Akiane not only gave permission for ASW to market and post its works, including new ones, but that it created videos to be posted to the ASW website so that sales of these works could be made. (*Id.* at ¶38). In fact, the posting of the video on ASW's site at Art Akiane's direction resulted in an $85,000 sale of a recent Akiane painting, "The Light." (*Id.* at ¶39).

***Art Akiane's Termination of the Licensing Agreement:*** When Art Akiane did give notice of the termination and non-renewal of the Licensing Agreement, it did so with a glowing 8 page letter to ASW which had a "Licensing Dissolvement Agreement" signed by Art Akiane and Akiane Art Gallery at the end. (*Id.* at ¶40). (A copy of the termination letter is attached to CC Decl. as Ex. 6). The letter contained phrases like, "The relationship between you and our family has been meaningful, fruitful and positive," and "The decade-long relationship between Art Akiane LLC, Akiane Art Gallery LLC and Art-SoulWorks continued to be mutually beneficial and progressive." (*Id.* at ¶41).

The Dissolvement Agreement, dated January 10, 2019, stated that as of January 11, 2019, ASW had to remove all "official" titles, change Facebook page names, remove all "official

source" titles from all Google web search pages, and remove all references to being an

"authorized" seller or distributor of Akiane's work, forego any "future posts" on all social medial

platforms, Google searches, websites that have anything to do with Akiane's "name," "brand" or

"artwork," etc. (*Id.* at ¶42). Furthermore, effect January 11, 2019, Art Akiane stated that ASW

could "no longer sell, license or distribute Akiane's artwork," and "all merchandise" associated

with Akiane's art had to be "discontinued." (*Id.* at ¶43). Finally, Art Akiane dictated that ASW

had only until March 1, 2019 to "liquidate" all inventory, but noted that the full royalty fee

would still be in effect. (*Id.* at ¶44).

Of course, this "Dissolvement Agreement" was not agreed to by ASW, nor was it

consistent with the parties' prior course of dealings which ASW and Corneliuson relied upon

based on the previous "business as usual" conduct between the parties. (*Id.* at ¶45). As of 2018,

the Akiane works and products made up approximately 85% of ASW's business. (*Id.* at ¶46).

The "Dissolvement Agreement" gave literally ***no*** notice to ASW before the "discontinuation of

everything" mandate supposedly kicked in, effective January 11. (*Id.* at ¶47). The Dissolvement

Agreement also attempted to improperly dictate ASW's conduct with respect to any works it had

already purchased under the wholesale agreement, as well as the works that were part of its own

private collection. (*Id.* at ¶48).

***ASW's and Corneliuson's Compliance with Art Akiane's Bad Faith Demands:*** ASW

and Corneliuson attempted in good faith to work with Art Akiane to extend the date of

liquidation listed in the termination letter. (*Id.* at ¶49). The parties went back and forth so many

times with respect to this issue that ASW packed and unpacked their merchandise again and

again each time it seemed that there would be a reprieve. (*Id.* at ¶50). Ultimately, there was not,

and ASW was forced to sell the remainder of its merchandise covered by the Licensing

Agreement at fire-sale prices. (*Id.* at ¶51). It did so prior to the artificially imposed March 1 deadline. (*Id.* at ¶52). In doing so, ASW lost hundreds of thousands of dollars that it would have obtained had it had a reasonable period of time in which to make the sales. (*Id.* at ¶53).

Prior to and following the termination, Art Akiane was well aware of the fact that ASW and Corneliuson resold works they had purchased through the wholesale agreement or from the private collection. (*Id.* at ¶54). In fact, in an email dated March 29, 2019, Foreli Kramarik, Akiane's mother and the "Original Art Acquisition Director" of the Akiane Gallery gave Corneliuson advice on the suggested resale prices, depending on whether Corneliuson wanted to sell the pieces quickly or more patiently. (*Id.* at ¶55; A copy of the Foreli Kramarik email is Ex. 7). Any suggestion that Art Akiane did not have notice of what ASW was doing is disproven by these communications.

In addition to liquidating its inventory covered by the Licensing Agreement as directed by Art Akiane, ASW also made the voluminous and time consuming changes to its website and other social media outlets as demanded by the termination letter. (*Id.* at ¶56). In addition to hiding hundreds of pages, with the Kramarik's blessing, ASW changed the many previous references from "exclusive source…" to "trusted source of Akiane art." (*Id.* at ¶57).

ASW went one step further. In the "About" section of its website, it states the following:

> We were pleased to be the exclusive global licensors and distributors of "Prince of Peace" and all art by Akiane Kramarik from 2006 through March 1, 2019. Considered one of the top 20 living artists, Akiane painted her first masterpiece "Prince of Peace," her portrait of Jesus, at age 8. Akiane, now 25 has informed us that she has chosen to be completely independent. We wish her well and hope that her visions of God, Jesus, and heaven continue to bless her and her artwork.

https://art-soulworks.com/pages/about-us. (*Id.* at ¶58)

Making these changes caused significant problems for ASW, as it resulted in the ASW website having hundreds of broken links and errors, as reflected in the SEMrush site audit report, attached to the Corneliuson Declaration as Ex. 8. (*Id.* at ¶59). Trying to fix these issues has cost ASW time and money. (*Id.* at ¶60). ASW continues to market for sale the works it purchased pursuant to the verbal wholesale agreement and works Corneliuson owns as part of the private collection. (*Id.* at ¶61). It has done so on the ASW website, Facebook page and through other social media avenues. (*Id.* at ¶62). ASW owns the domain name "Jesusprinceofpeace.com," which points to the ASW website. (*Id.* at ¶63). ASW has every right to this name, as Art Akiane did not coin this phrase – it is prominently contained in the Bible, and universally used to refer to Jesus Christ. Similarly, ASW has every right to show pictures of the works that it owns and is selling. Hundreds of people and other entities selling Akiane work they own are doing the same on sites like, Etsy, Ebay, Pinterest, in Facebook groups or on their own websites. (*Id.* at ¶64; Examples of these sites are attached to the Corneliuson Declaration as Ex. 9.)

The Kramariks and Art Akiane knew that the Akiane merchandise made up the vast majority of Art & SoulWork's business. It knew or should have known that terminating the parties' relationship on a moment's notice, replete with extensive demands to *immediately* remove all references to the parties' more than 10-year relationship would be debilitating if not the death knell of the ASW business. Nevertheless, it insisted on this path and now opens its unclean hands to this Court in prayer for substantial equity despite failing to bestow any on ASW.

ARGUMENT[2]

**I.    Art Akiane Has Not Made the Required "Threshold Showing" That It Is Entitled to a Temporary Restraining Order**

A temporary restraining order is an "extraordinary equitable remedy" that is only warranted when the movant shows "clear need." *Traffic Tech., Inc. v. Kreiter*, No. 14-cv-7528, 2015 WL 9259544, at *16 (N.D. Ill. Dec. 18, 2015). To obtain such relief, the party seeking a temporary restraining order must make a threshold showing that: (1) absent injunctive relief, it will suffer irreparable harm in the interim prior to a final resolution; (2) there is no adequate remedy at law; and (3) it has a reasonable likelihood of success on the merits. *Id*. Art Akiane's Motion for TRO should be denied because it has not, and cannot, meet this initial burden.

**A.    Art Akiane Has Not Established That It Will Suffer *Imminent* and Irreparable Harm in the Absence of a Temporary Restraining Order**

First, Art Akiane has not and cannot identify a single action taken by Defendants that constitutes an emergency now.  Plaintiff's Memo states that the actions at issue have been occurring since the termination of the Licensing Agreement on January 11, 2019, yet Art Akiane waited until mid-May to file its motion.  (Memo. at 1).

Second, as discuss above and further below, all display, marketing and sales of Akiane art by ASW following the artificially imposed March 1, 2019 "liquidation" deadline has been in connection with the "right of first sale" doctrine for inventory purchased as part of the parties'

---

[2]    Plaintiff's complaint asserts federal question and supplemental state jurisdiction.  On its face, there is also diversity jurisdiction of the parties.  (Complaint, Dkt. 1, ¶¶ 5-8).  Generally, a district court sitting in diversity applies the choice of law rules of the state in which it sits. *Jackson v. Payday Fin., LLC*, 764 F.3d 765, 774 (7th Cir. 2014).

"wholesale sales" agreement, or purchased as part of Corneliuson's private collection. Thus, no infringement has occurred.[3]

Further, even if infringement could be established, and it cannot, Art Akiane has only pointed to alleged acts of infringement, pled and declared largely on "upon information and belief" and concluded that because there is alleged infringement, this Court must *presume* irreparable harm and enter a TRO. However, the presumptive standard Art Akiane cites no longer applies ***and*** it has failed to provide any threat of imminent harm in the absence of a temporary restraining order.

The standard for many years in the Seventh Circuit *was* that when a plaintiff's copyright or trademark is being infringed, the Plaintiff will suffer irreparable harm and have no adequate remedy at law without an injunction. See, e.g., *Eli Lilly & Co. v. Nat. Answers, Inc.*, 233 F.3d 456, 469 (7th Cir. 2000). That presumption is no longer favored following the United States Supreme Court opinion in *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006), which declined to replace traditional equitable considerations with a rule that an injunction automatically follows a finding of infringement. The *eBay* case has created an ever widening standard across numerous circuits that in patent, trademark and copyright cases, merely pointing to an infringement and citing the presumption as a basis for irreparable harm is not enough.

In the Seventh Circuit, *eBay* now applies to copyright infringement cases. See *Flava Works, Inc. v. Gunter*, 689 F.3d 754, 755 (7th Cir. 2012) (noting that *eBay* is applicable in copyright cases). Though the Seventh Circuit has not expressly found an extension of *eBay* to

---

[3]     The voluminous exhibits cited by Mark Kramarik in his Declaration and attached to the Complaint as evidence of infringement reflect posts made prior to the termination of the agreement while the parties' Licensing and wholesale sales agreements were in effect. These uses by Defendants were both endorsed by Art Akiane, and often facilitated by them. (Corneliuson Decl. at ¶¶15, 20-23). Any posts made by Defendants since then relate to the lawful sales of under the right of first sale.

trademark cases yet, many other Circuits have, and many district courts in the Seventh Circuit have assumed that the Seventh Circuit would join its sister circuits in doing so. See *Nat'l Fin. Partners Corp. v. Paycom Software, Inc.*, 2015 WL 3633987, at *11 (N.D. Ill. June 10, 2015). *Mkt. Track, LLC v. Efficient Collaborative Retail Mktg., LLC*, 2015 WL 3637740, at *23 (N.D. Ill. June 12, 2015); see also *Swarovski Aktiengesellschaft v. Bldg. No. 19, Inc.*, 704 F.3d 44, 54 (1st Cir. 2013); *Ferrlng Pharm., Inc. v. Watson Pharm., Inc.*, 765 F.3d 205, 216 (3d Cir. 2014); *Audi AG v. D'Amato*, 469 F.3d 534, 550 (6th Cir. 2006); *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1248-49 (9th Cir. 2013).

Assuming that there is no presumption of irreparable harm and a specific showing of irreparable harm and no adequate remedy at law is required, Art Akiane has not sufficiently provided a basis to justify such a finding. In fact, the claims at issue in the TRO Motion are the supposed continued sale of Art Akiane copyrighted and trademarked material and the alleged failure by Defendants to provide Art Akiane with buyer contact information.[4] Both of these are clearly remediable with money damages and neither require emergency action.

### B. Art Akiane Has Not Established That It Is Likely to Succeed on the Merits of Its Claims Against Defendants

#### 1. Defendants Have Not Committed Any Copyright Violations

Defendants entered into a 1.5 page Licensing Agreement with Art Akiane, three separate times, for a period of 11 years. This Licensing Agreement expressly granted ASW the right to use the art in "promotional advertisements and materials, and for all promotional purposes in connection with [ASW's] website and Internet related business without cost or royalty. (CC Decl,

---

[4] Exhibits _ and _ to the Corneliuson Declaration prove that these allegations are wholly without merit, and these are merely representative exhibits of the many instances in which Art Akiane had unfettered access to and knowledge of the ASW customers buying Akiane art.

Ex. 1 ¶ D). At Art Akiane's request, in order to maximize the art's exposure and sales, the parties also entered into a verbal agreement for paintings, prints and canvasses and engaged in a continuous course of dealings where ASW would coordinate with Art Akiane or the Akiane Gallery to display Akiane's works that it would then purchase at wholesale and resell. Defendants also had a private collection of works, purchased at full price. Following notice of termination by Art Akiane, Defendants liquidated the inventory of product governed by the Licensing Agreement. They too extensive efforts to modify the websites and social media sites to indicate they were no longer the "official distributor" of Akiane products, noting the same in its "About" section and changing the wording on its sites to Kramarik-approved, "trusted source" of Akiane art. The display of art on ASW's website or social media outlets that remains falls under the "First Sale Doctrine." Furthermore, Art Akiane has already been compensated in full for the pieces at issue.

It is not clear from Plaintiff's complaint or motion the exact infringing actions supposedly undertaken by Defendants. It appears that Plaintiff believes that Defendants are making exact copies, *i.e.,* generating its own prints, of the copyrighted works which were previously licensed to Defendants, and reselling those copies. However, that is not the case. ASW liquidated at a large financial loss all of the items that it had produced under the Licensing Agreement. (CC Decl. at ¶_). There is no manufacturing, printing or copying of any materials that are no longer licensed.

Fundamentally, the Copyright Act of 1976 ("Copyright Act"), 17 U.S.C. § 101, grants copyright owners exclusive rights to reproduce the copyrighted work, prepare derivative works based upon the copyrighted work, distribute copies of the copyrighted work, and to display the copyrighted work, but these rights are not absolute. However, a copyright holder's distribution right is not absolute. The first sale doctrine, codified at 17 U.S.C. § 109, allows an individual who legally acquired a lawfully-made copy of a copyrighted work to sell or otherwise transfer that

particular copy as he or she wishes. *Lee v. Deck the Walls, Inc.*, 925 F. Supp. 576, 578 (N.D. Ill. 1996). The First Sale Doctrine "provides, in essence, that once the copyright owner has transferred ownership of a particular copy of the work, the person to whom the copy has been transferred is entitled to dispose of it by sale, rental, or any other means." *Id.* at 583, citing to *Parfums Givenchy v. C & C Beauty Sales*, 832 F. Supp. 1378, 1385 (C.D. Cal. 1993) (citing H.R. Rep. No. 1476, 94th Cong., 2d Sess. 79 (1976)).

Although the first-sale doctrine does not "entitle the owner of a particular copy of a copyrighted item to publicly display copyrighted images to the world via the Internet," *Bryant v. Gordon*, 483 F. Supp. 2d 605, 613 (N.D. Ill. 2007), it does entitle the owner to "sell or otherwise dispose of" the copy. 17 U.S.C. § 109(a). Online display of lawfully acquired prints to promote their sale would be a fair use. *Id.* at § 107. *Boehm v. Svehla*, No. 15-cv-379-jhp, 2017 WL 4326308 at *17 (Sept. 27, 2017 W.D. Wis.)

To the extent Plaintiff is claiming that the posting of images on various websites and social media pages violates their copyrights, they have failed to properly plead any such violation and regardless, given the factual circumstances, this is not actionable. While there may be images of paintings Defendants on display and the "copyright notice" for such pieces is not visible because of the way the art is displayed, this is remedied because in no instances does ASW hide the fact that these are works created by Akiane. In fact, the majority of plaintiff's motion complains of the fact that Defendants are using her name (which, ironically she contends is also her Marks").

Furthermore, it is entirely disingenuous, bordering on frivolous, that Mark Kramarik attested in his Declaration that "upon information and belief, Defendants have been copying, displaying, distributing and selling Art Akiane's other works, despite *never having been granted licensing rights to do so under the Agreement.*" (Mark Kramarik Decl. at 23). The evidence

15

attached to Corneliuson's Declaration indicates that not only did Art Akiane *know* about the sales of these works, they facilitated them and were happy to reap the benefits of them.

### 2. Art Akiane Does Not Have Trademark Claims

Plaintiff has alleged trademark violations pursuant to Section 43(a) of the Lanham Act due to Defendants' supposed use of "marks" that are "owned" by Plaintiff. First, Plaintiff has once again failed to properly plead what supposed "mark" Defendants are infringing. It references Exhibit B to the Complaint, and the words Art Akiane, but doesn't make clear if the mark is the stylized version of Art Akiane, Art Akiane itself, or some other "mark" that is somehow being used. What is clear is that Plaintiff has no trademark registrations. Instead, she relies on common law rights but fails to adequately explain the violation.

Second, the United States Supreme Court in *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 US 23 (2003) made clear that a Plaintiff cannot use the Lanham Act to create a limitless protection for what is otherwise a limited copyright protection. *Id.* at 32-38. Art Akiane is alleging that Defendants misrepresented the "origin" of the goods it sold and because Art Akiane is the true "origin" of the marks, there is confusion to the public. However, the *Dastar* Court held:

> [R]eading the phrase 'origin of goods' in the Lanham Act in accordance with the Act's common-law foundations (which were *not* designed to protect originality or creativity), and in light of the copyright and patent laws (which *were* ), we conclude that the phrase refers to the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods. Cf. 17 U.S.C. § 202 (distinguishing between a copyrighted work and "any material object in which the work is embodied"). To hold otherwise would be akin to finding that § 43(a) created a species of perpetual patent and copyright, which Congress may not do. See *Eldred v. Ashcroft,* 537 U.S. 186, 208, 123 S.Ct. 769, 154 L.Ed.2d 683 (2003)."

*Id.* at 37. *See also Personal Keepsakes, Inc. v. PersonalizationMall.Com, Inc.*, 975 F.Supp.2d 920 (N.D. Ill. 2013).

Further, if what Plaintiff is claiming is a "false or misleading representation of fact" they have no likelihood of success on the merits because the website and social media sites in question go out of their way to indicate that the work belongs to Art Akiane, even mentioning the Akiane Gallery in various instances. Defendants went to great lengths, including working with plaintiff, to change the many pages of display related to Akiane works and to alert the public that it was no longer the "official distributor" of Akiane art.[5] Plaintiff's claims are copyright violation claims, not trademark violations, but even if they are trademark claims, they fail.

### 3. Defendants Have Not Violated the Digital Millennium Copyright Act

The Digital Millennium Copyright Act (DMCA) provides copyright owners protections in the digital age by forbidding the distribution of false copyright management information ("CMI") or its outright removal. See 17 U.S.C. § 1202. CMI "is defined as the information about the copyright that is 'conveyed in connection with copies' of the work, including the title of the work, the author of the work, the name of the copyright owner, and identifying numbers or symbols referring to copyright information." *Personal Keepsakes, Inc. v. PersonalizationMall.Com, Inc.*, 975 F.Supp.2d 920, 928 (N.D. Ill. 2013). However, simply not properly "linking up" the image with the proper CMI is not actionable. *Id.* at 929. *See also Kelly v. Arriba Soft. Corp.*, 77 F.Supp.2d 1116, 1122 (C.D.Cal. 1999) (CMI appeared in the surrounding text but not the images. The DMCA removal provision only applies to the removal of CMI on the original product, not simply printed somewhere on the website.) In addition, the DMCA requires intent on the part of Defendants. Plaintiff has not established the requisite intent by Defendants to mislead, and therefore does not

---

[5] Even plaintiff's website utilizes the "images" of people in connection with a description of Akiane and her work. For example, the website prominently displays a picture of Oprah Winfrey. https://akiane.com/

have a likelihood of success on the merits of this claim. *Monotype Imaging, Inc. v. Bitstream, Inc.*, 376 F.Supp.2d 877, 892 (N.D. Ill 2005).

As with copyright and trademark, Plaintiff has failed to provide the requisite information necessary to determine what supposed CMI was removed or falsely distributed. However, assuming Plaintiff is referencing removal of CMI on various online images, Defendants have not violated the DMCA. In every location that Defendants have posted Plaintiff's copyrighted images, regardless of the lack of any signature or © on the image, Defendants include attribution to Akiane or Akiane Gallery that reference the required CMI of title of the work, the author of the work, and the name of the copyright owner.

### 4. Art Akiane's State Law Claims Are Preempted

Finally, all of plaintiff's state law causes of action are preempted by the copyright claims. "To 'avoid preemption, [the] law must regulate conduct that is quantitatively distinguishable from that governed by federal copyright law – i.e., conduct other than reproduction, adaption, publication, performance and display.'" *Personal Keepsakes, Inc. v. Personalizationmall.com, Inc.*, No. 11 C 5177, 2012 WL 414803 at & 8 (Feb. 8, 2012 N.D. Ill.), citing *Toney v. L'Oreal USA, Inc.*, 406 F.3d 905, 910 (7th Cir. 2005).

A state law claim is preempted by the Copyright Act where: (1) the work is within the subject matter of copyright; and (2) the rights available under state law are equivalent to any of the exclusive rights provided by § 106 the Copyright Act." *Id.* citing to See *ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447, 1453 (7th Cir. 1996) (citing 17 U.S.C. § 301(a)); see also *Baltimore Orioles, Inc. v. Major League Baseball Players Ass'n*, 805 F.2d 663, 674 (7th Cir. 1986). A right can be "equivalent" even if it requires additional elements to make out a cause of action, if those additional elements do not differ in kind from those necessary to avoid copyright infringement. *Id.* at 676-78.

As many courts in the Norther District have noted, every copyright claim inherently involves the notions of unfair competition and consumer confusion and deception, because it is fundamentally not fair competition and confusing to customers to rip off another's protected work. *Id. See Cyber Websmith*, 2010 WL 3075726 at *3 (collecting cases finding that consumer confusion issues are present in all copyright cases and such elements "are not considered extra elements that qualitatively alter the nature of a claim where they are asserted"); *Natkin v. Winfrey*, 111 F. Supp. 2d 1003, 1013 (N.D. Ill. 2000) (dismissing state law claims and noting that the plaintiff did nothing more than re-allege the same facts as the copyright claim and state those actions also violated the Illinois unfair competition and consumer fraud statutes).

In short, Plaintiff's state law claims are simply copyright claims in different clothing, and they are preempted by the Copyright Act.

## C.     Plaintiff has Unclean Hands

Plaintiff's motion should also be denied because it seeks an equitable remedy despite having unclean hands. The unclean hands doctrine "closes the door of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief . . . ." *ABF Freight Sys., Inc. v. NLRB*, 510 U.S. 317, 329-330 (1994) (internal quotations omitted); *Zahl v. Krupa*, 850 N.E.2d 304, 309-10 (Ill. App. Ct. 2006) (unclean hands doctrine bars equitable remedies). Here, Art Akiane asks for equity even though it acted improperly by violating the duty of good faith and fair dealing in terminating the parties' relationship with no notice even though it knew that doing so would debilitate, if not destroy, the ASW business. It chose this path even though it was well aware that ASW was acting in reliance of the parties' previous course of dealings in renewing the agreements, and despite knowing that ASW had an enormous amount of inventory and had made commitments well into 2019 for the continued business.

19

There is no dispute that, under Illinois law, every contract contains an implied promise of good faith and fair dealing unless it expressly provides otherwise. *Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 395 (7th Cir. 2003). The Licensing Agreement is no exception. In addition, with respect to the verbal wholesale agreement, the parties had an established course of dealings with respect to this relationship, and that course of dealings included the ability to continue to purchase Art Akiane work for resale. A course of dealings is a sequence of previous conduct between the parties which can be fairly regarded as establishing a common basis of understanding for interpreting their expressions and other conduct. Under Illinois law, courts may consider the course of dealings between the parties when determining the terms of an oral contract. *H & H Press, Inc. v. Axelrod,* 638 N.E.2d 333, 338–39 (Ill.App.Ct. 1st Dist.1994)*; see also Capitol Converting Equipment, Inc. v. LEP Transport, Inc.,* 965 F.2d 391, 396 (7th Cir.1992) (course of dealing established that liability limitation contained on transportation company's invoice was part of agreement). Plaintiff should not be rewarded for its role in the situation the parties now face, and should the matter proceed to full-blown litigation, Defendants' counterclaims against Art Akiane will eliminate any likelihood of success on the merits of plaintiff's own claims.

### D.      Defendants Will Be Significantly Harmed If They Are Enjoined from Selling

Art Akiane has dealt an effective death blow to ASW's business, and that business now faces an existential crisis. Defendants have already liquidated inventory connected to the Licensing Agreement at a significant loss. Their personal art is worth more than $600,000.00 and they continue to hold inventory under the wholesale agreement that at retail would constitute hundreds of thousands of additional dollars. The balance of the equities here significantly outweighs the granting of plaintiff's motion, as Defendants, a small business currently hanging by a thread due to plaintiff's conduct has far more to lose than Art Akiane does if an injunction is issued.

### E.     Any Injunction Requires a Significant Bond

It is well established in the Seventh Circuit that the damages payable to a person injured by an erroneously issued injunction cannot exceed the amount of the bond. *Roche Diognostics Corp. v. Medical Automation Systems, Inc.*, 646 F.3d 424, 428 (7th Cir. 2011) citing to *W.R. Grace & Co. v. Rubber Workers,* 461 U.S. 757, 770 n. 14, (1983). *See also*; *Coyne–Delany Co. v. Capital Development Board,* 717 F.2d 385, 393–94 (7th Cir.1983). "Judges therefore should take care that the bond is set high enough to cover the losses that their handiwork could cause. A limit of zero— the upshot of an injunction without a bond—is bound to be too low." *Id.*

Here, the plaintiff asks that this Court set a bond of $10,000 should it be successful on its motion.  That amount is far too low and would be exceeded by the price of even a single piece of art owned by the Defendants.  Here, the value of the art still lawfully held and that can be sold by Defendants exceeds $1 million.  Accordingly, any bond should be set in that amount.

Respectfully submitted,

Dated:  May 22, 2019

*/s/ Nicole N. Auerbach* _____

Nicole N. Auerbach
Patrick J. Lamb
Salvador Carranza
ELEVATENEXT LAW
218 N. Jefferson Street, Suite 300
Chicago, IL  60661
(312) 676-5460 - Telephone
nicole.auerbach@elevatenextlaw.com
Patrick.lamb@elevatenextlaw.com
Salvador.carranza@elevatenextlaw.com

## <u>CERTIFICATE OF SERVICE</u>

I certify that on May 22, 2019, I caused a copy of the attached Response to be served upon all counsel of record via the Court's ECF system.

*/s/ Nicole N. Auerbach*
Nicole N. Auerbach